### INDIANA FARMER'S GUIDE PUB. CO. v. PRAIRIE FARMER PUB. CO.

et al.

No. 5065.

Circuit Court of Appeals, Seventh Circuit.

March 30, 1934.

U. S. Lesh, of Indianapolis, Ind., Eben Lesh, of Huntington, Ind., James E. Lesh, of Indianapolis, Ind., and Joseph H. Lesh, of Huntington, Ind., for appellant.

J. L. Parrish, of Des Moines, Iowa, Maxwell V. Beghtol, of Lincoln, Neb., Thomas E. Murphy, of Chicago, Ill., and Burke G. Slaymaker and Clarence F. Merrell, both of Indianapolis, Ind., for appellees.

Before ALSCHULER, EVANS, and FITZHENRY, Circuit Judges.

EVANS, Circuit Judge.

Appellant brought this action to recover damages resulting from appellees' alleged illegal agreements or combinations which, it is asserted, violated sections 1, 2, and 7 of the Sherman Anti-Trust Act (15 USCA §§ 1, 2, 15 note). Treble damages were sought as allowed by said section 7.

Appellees defended on several grounds, the two principally relied on being: (a) No interstate commerce was involved in the alleged illegal combinations which dealt with the subject of magazine advertising. Blumenstock v. Curtis Publishing Co., 252 U. S. 436, 438, 40 S. Ct. 385, 64 L. Ed. 649. (b) The agreement which appellees executed did not create a monopoly nor did it have the effect of unlawfully restraining interstate commerce in the manner condemned by the act. Appalachian Coals, Inc., v. U. S., 288 U. S. 344, 53 S. Ct. 471, 77 L. Ed. 825; Standard Oil Co. v. U. S., 283 U. S. 163, 51 S. Ct. 421, 75 L. Ed. 926.

The court directed a verdict in favor of appellees.

Sections 1 and 2 of the act (15 USCA §§ 1, 2) read as follows:

Section 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor. * * * *"

Section 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * * *."

In view of our acceptance of appellees' second contention, the statement of facts will be directed to the issue thus presented.

The facts: Appellant is an Indiana corporation engaged in publishing a farm paper or magazine which circulates in Indiana and other states in the Middle West and has its plant and principal place of business in Huntington, Indiana. It has for years transacted a large and successful business, being the leading farm magazine published in Indiana.

Appellees, with the exception of the Midwest Farm Paper Unit, are corporations organized in states other than Indiana. They were all engaged in publishing farm magazines. They published them as follows: The Prairie Farmer, two magazines, one in Illinois and one in Indiana; Wallace Publishing Company, one farm magazine in Iowa; the Wisconsin Farmer Company, one magazine in Wisconsin; The McKelvie Publishing Company, one magazine in Nebraska; The Webb Publishing Company, two editions of a magazine, one edition circulating in Minnesota and the other in the Dakotas.

The Midwest Unit is a corporation which was organized in 1931, to succeed a copartnership which was formed in 1928. Its directors and officers were composed of representatives of the five last-named publishing companies.

Appellant averred and proved that advertising is essential to the successful conduct of a farm magazine, and is its life blood. There are two kinds of advertising, commercial and classified. The latter is in small type under classified headings, and the former is in display type. The revenue derived from the former far exceeds that obtained from classified advertising. Appellant's grievance is directed largely to the commercial advertising.

Midwest Farm Paper Unit was the representative or agent of the other appellees, and its business was the solicitation of joint advertising for said magazines. The complaint alleged that appellees who joined in forming said Midwest Farm Paper Unit

"entered into a contract, combination and conspiracy for the purpose of obtaining a monopoly of the farm paper business, including the publication, circulation, and distribution of printed matters and of advertisements of peculiar interest to farmers within the territory covered by the aforesaid publications; that in furtherance of this combination and conspiracy, they conceived a plan and design calculated to break down and destroy competition with other farm publications within said territory; that in order to effectuate that purpose they agreed upon a combination schedule of advertising rates for their combined publications, including the Indiana Edition of The Prairie Farmer and the Dakota Edition of The Farmer and Farm, Stock and Home, materially below the combined rates for the separate publications; that it was a part of said contract, combination and conspiracy

that no other publisher of any farm journal circulating within said territory should be allowed to join with them in carrying any of the advertising business on equally favorable terms as fixed in the combination schedules, nor should any advertiser be allowed relatively reduced rates for the combination publications exclusive of the Indiana Edition of The Prairie Farmer or the Dakota Edition of The Farmer and Farm, Stock and Home."

The practice followed by appellees was to offer to the large advertisers space in all magazines for a sum less than would be charged for space in only five such magazines if advertising were placed in each separately.

Appellant offered exhibits showing full page advertisements carried by Midwest Farm Paper Unit in each of appellees' magazines, which showed that advertisers who carried full page advertisements in all the magazines published by the five appellees paid less by about $1,000 than when like advertisement was contracted separately with each publishing company. They further advertised that if Prairie Farmer (Indiana edition) were substituted for advertisement in appellant's magazine and the joint rate for all magazines of all five appellees taken, the saving would be $1,081.20 an issue.

Appellant also showed that because of such competition it lost some of its advertisers and, upon a theory explained by its accountant (not material here), it was damaged in the sum of $145,000.

To support their contention that no monopoly was created and no unlawful restrictions placed upon free competition of magazines for the advertising of the larger advertisers, charts and statistics appear which showed the size, growth, and trend of farm magazines and the amount of advertising, etc., during the years 1928 to 1932. Briefly, such figures disclosed: From 1928 to 1932, inclusive, there were approximately 300 different weekly magazines published in the United States, devoted chiefly to agriculture and the interest of the farmer, and whose subscribers were for the most part, farmers or city agriculturists who owned farms. The total number of all such magazines circulated in Indiana was 669,989. There were 181,575 farms in Indiana, as shown by the United States 1930 census. In other words, there were published and circulated more than three farm magazines to each farm in Indiana. Farm magazines are divided into two classes: national and state. The na-

tional farm magazines have a national circulation. These national magazines had a circulation in Indiana of 365,274 or two national magazines to each farm. Appellant's circulation in 1928 was 160,000. It remained the same in 1929, 1930, and 1931. In 1932, it was 165,000.

In 1928, the percentage of appellees' magazines of all farm journal advertising was 14.96 per cent. In 1929, it was 15.61 per cent.; in 1930, 17.79 per cent.; in 1931, 18.15 per cent.; and in 1932, 17.52 per cent.

The 1928–1932 depression was so severe that the total advertising in farm periodicals decreased from twenty million lines to eight million lines.

From 1928 to 1932, appellant lost 71 per cent. of its business; the Nebraska Farmer lost 70 per cent.; the Prairie Farmer lost 66 per cent.; Wallace's Farmer lost 59 per cent.; and the Wisconsin Agriculturalist lost 57 per cent.

The number of farm magazines published in the various states was given as follows: Wisconsin, nine; Nebraska, three; Minnesota, eight; Illinois, thirty; Indiana, ten; Iowa, eighteen; North Dakota, one; and South Dakota, one.

Farm magazines (state as well as national) find competitors for advertisements in the radio, mails, billboards, general magazines, farm organization papers, and country newspapers.

Appellees contended that they united only to more successfully compete with the so-called national farm magazines. The advertisers were attracted by the combined circulation through which they enjoyed certain economies such as the avoidance of duplicates in electro-types, etc.

In disposing of the appeal we have accepted appellant's assertion that it lost some commercial advertisers due to the combination rate of appellees. We are, however, not satisfied that appellant has established a fact which rested upon it to prove; viz., that through this combination there was effected such a restraint of interstate commerce as would materially affect the entire farm journal advertising business.

Such is the requirement laid down in Standard Oil Co. v. United States, 283 U. S. 163, 51 S. Ct. 421, 75 L. Ed. 926. The facts in that case indicated a much greater control of the gasoline production industry than is present in the case before us. In that case there was evidence showing that the contract was constantly increasing the control of the companies that monopolized the cracking processes in the oil industry. Not only had there been a steady increase in the amount of oil produced by this process, but the contract which was sought to be restrained, and which it was alleged had a strong tendency to stifle competition, had twenty-five years yet to run. The court held there was, nevertheless, no restraint of competition such as violated sections 1 or 2 of the Sherman Anti-Trust Act. Likewise, it seems the facts in Appalachian Coals, Inc., v. United States, 288 U. S. 344, 53 S. Ct. 471, 77 L. Ed. 825, presented a case of much stronger domination by the combinations that had formed than the one before us. We recognize there are essential fact differences which make comparisons of different industries of little value. But we cannot escape the force of appellees' statement—

" * * * If, as held in Standard Oil v. United States, 283 U. S. 163, 51 S. Ct. 421, 75 L. Ed. 926, the owners of 55 per cent of the gasoline in the United States could not by combination obtain a monopoly in violation of the Sherman Act, and if, as held in Appalachian Coals v. United States, 288 U. S. 344, 53 S. Ct. 471, 77 L. Ed. 825, the owners of 74 per cent of the coal mined in a certain territory could not obtain a monopoly in violation of the Sherman Act, then how can it be held that 5 out of approximately 300 newspapers can obtain a monopoly of advertising, and how can it be held that newspapers which do only approximately 15 per cent of the advertising in the farm journal field can obtain a monopoly?"

In the face of these two decisions we agree with Judge Baltzell that a proper case for the application of sections 1, 2, and 7 of the Sherman Anti-Trust Act was not established.

The judgment is affirmed.